(No. 100197.—

THE ILLINOIS STATE CHAMBER OF COMMERCE,
Appellee, v. JOHN FILAN, in his Capacity as Direc-
tor of the Governor's Office of Management and
Budget, *et al.*, Appellants.

*Opinion filed October 6, 2005.*

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Brian F. Barov, Assistant Attorney General, of Chicago, of counsel), for appellants.

Thomas H. Donohoe, Jane Wells May and Matthew S. Mock, of McDermott, Will & Emery, L.L.P., of Chicago, for appellee.

JUSTICE GARMAN delivered the opinion of the court:

This case concerns the constitutionality of a portion of Public Act 93—32, known as the FY2004 Budget Implementation (State Finance-Revenues) Act (Budget Act) (Pub. Act 93—32, eff. in relevant part on June 20, 2003). The circuit court of Cook County granted partial summary judgment to plaintiff, the Illinois State Chamber of Commerce (Chamber), finding the Budget Act unconstitutional as applied to the Chamber, based on violations of the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, § 2) and the due process clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). The circuit court entered a finding under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)), and defendants appealed to this court.

BACKGROUND

In 2003, the State of Illinois was in the midst of a budget crisis, facing a deficit of nearly $5 billion for fiscal year 2004 (FY2004). Effective in relevant part June 20, 2003, the General Assembly enacted Public Act 93—32, implementing the state's budget for FY2004. In submitting a proposed budget for FY2004, the Governor explained in his budget summary (Budget Summary) the steps proposed to address the state's fiscal emergency. Two of those steps are relevant to this case and were included in the Budget Act. First, the Budget Act both

established new fees and increased others. The Budget Summary referred to these fees as "Non-Consumer User Fees." The stated purpose of the new and increased fees was to bring "user fees for state regulatory services and licenses in line with other states in order to recover actual program costs, generating over $300 million in new revenue to the state in fiscal year 2004." Illinois State Budget, Fiscal Year 2004, at 1—10. Approximately 300 fees were to be affected by this provision. Secondly, a mechanism used by the Budget Act called "Administrative Cost Allocations" provided for the transfer of monies in certain funds to the General Revenue Fund (GRF). The Budget Summary explained this mechanism as follows:

"In order to ensure that each fund is paying its 'fair share' for administrative services and oversight provided with general funds, this budget creates a charge based on the level of revenue and activity of each fund. Many funds require a full array of state services, including accounting, investing, auditing, leasing and legal representation. Many of these services are supported through the General Revenue Fund. A $330 million charge for services will be assessed on funds. To partially pay for prior administrative cost subsidies, $144 million in fund balances will be transferred from select funds to the General Revenue Fund in fiscal year 2003. The total revenue generated from administrative cost allocations is $474 million." Illinois State Budget, Fiscal Year 2004, at 1—10.

Transfers from these funds to the GRF were authorized by three new provisions added to the State Finance Act by Public Act 93—32. Section 8.42 (30 ILCS 105/8.42 (West 2004)) authorized transfers of specified amounts from certain listed funds to the GRF, known as "interfund transfers." The parties also refer to these transfers as "fund sweeps." Section 8h (30 ILCS 105/8h (West 2004)) authorizes the Director of the Bureau of the Budget (now known as Office of Management and Budget (OMB) (20 ILCS 3005/9.5 (West 2004)) to direct the State

Treasurer and Comptroller to transfer specified sums, to be determined by the Director as set forth in that section, from any fund held by the State Treasurer to the GRF. Section 8j (30 ILCS 105/8j (West 2004)) targeted the new and increased Non-Consumer User Fees and provides:

"Notwithstanding any other law to the contrary, additional amounts generated by the new and increased fees created or authorized by this amendatory Act of the 93rd General Assembly and by Senate Bill 774, Senate Bill 841, and Senate Bill 842 of the 93rd General Assembly, if those bills become law, shall be allocated between the fund otherwise entitled to receive the fee and the General Revenue Fund by the Bureau of the Budget. In determining the amount of the allocation to the General Revenue Fund, the Director of the Bureau of the Budget shall calculate whether the available resources in the fund are sufficient to satisfy the unexpended and unreserved appropriations from the fund for the fiscal year.

In calculating the available resources in a fund, the Director of the Bureau of the Budget may include receipts, transfers into the fund, and other resources anticipated to be available in the fund in that fiscal year.

Upon determining the amount of an allocation to the General Revenue Fund under this Section, the Director of the Bureau of the Budget may direct the State Treasurer and Comptroller to transfer the amount of that allocation from the fund in which the fee amounts have been deposited to the General Revenue Fund; provided, however, that the Director shall not direct the transfer of any amount that would have the effect of reducing the available resources in the fund to an amount less than the amount remaining unexpended and unreserved from the total appropriation from that fund for that fiscal year.

The State Treasurer and Comptroller shall transfer the amounts designated under this Section as soon as may be practicable after receiving the direction to transfer from the Director of the Bureau of the Budget." 30 ILCS 105/8j (West 2004).

Relevant to the instant case, the Illinois Workers'

Compensation Commission Operations Fund (formerly known as the Industrial Commission Operations Fund (820 ILCS 305/13 (West 2004)) (Operations Fund) is a special fund created in the State Treasury (820 ILCS 305/4(a—1) (West 2004)). Subject to appropriation, all money in the fund is to be used solely for operations of the Commission. 820 ILCS 305/4(a—1) (West 2004). The Chamber employs approximately 25 persons in Illinois and maintains a workers' compensation insurance policy. The Budget Act created two separate fees to be paid by employers into the Operations Fund. One was the Industrial Commission Operations Fund surcharge (now known as the Illinois Workers' Compensation Commission Operations Fund surcharge (820 ILCS 305/13 (West 2004)) (surcharge) and the other was the Industrial Commission Operations Fund fee (now known as the Illinois Workers' Compensation Commission Operations Fund fee (820 ILCS 305/13 (West 2004)) (Fund fee). The Budget Act amended the Illinois Insurance Code by adding new section 416 (215 ILCS 5/416 (West 2004)). That section required insurance companies that insure employers' liabilities under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2004)) or the Workers' Occupational Diseases Act (820 ILCS 310/1 *et seq.* (West 2004)) to remit a surcharge based on the annual direct written premium of the insurance company to be deposited in the Operations Fund. The rate was set at 1.5% of direct written premium and was to be collected from employers by their insurance companies as a separately stated surcharge. Pub. Act 93—32, eff. in relevant part June 20, 2003 (adding 215 ILCS 5/416(b)(1), (b)(2)). In 2004, the Chamber paid a surcharge of $148. The Fund fee was established by adding new section 4d to the Workers' Compensation Act. Pub. Act 93—32, eff. in relevant part June 20, 2003 (adding 820 ILCS 305/4d). This fee was to be charged to self-insured employers at a rate

equal to 0.045% of annual actual wages paid in Illinois. That fee is also deposited in the Operations Fund. Pub. Act 93—32, eff. in relevant part June 20, 2003 (adding 820 ILCS 305/4d(b)). The General Assembly budgeted $13.7 million to operate the Commission in FY2004. The surcharge and the Fund fee were expected to generate approximately $30 million. Fiscal Year 2003 Comptroller's Fee Imposition Report, at 5.

In April 2004, the Chamber filed a two-count complaint asking for a declaratory judgment and for injunctive relief. Count I alleged that the surcharge was intentionally set at a level in excess of the cost of operating the Commission and that the Chamber's obligation to pay the surcharge made it a Non-Consumer User Fee payer. Those fee payers not targeted by the Budget Act for fee increases were referred to by the complaint as "Non-Burdened Fee Payers." The complaint further alleged that there is no real and substantial difference between the Chamber and the Non-Burdened Fee Payers because they all engage in activities that require the state to impose regulation or provide a service. According to the complaint, the Budget Act violates the uniformity clause because it singles out persons, including the Chamber, to pay a charge deliberately designed to generate revenues in excess of the amounts needed to operate the Commission and provides for the transfer of excess revenue to the GRF. Count I prayed for (1) a declaratory judgment that the Budget Act violates the uniformity clause; (2) an injunction barring defendants from requiring insurers to charge or employers to pay the surcharge; (3) an injunction barring the transfer of funds from the Operations Fund to the GRF; and (4) a mandatory injunction requiring all money transferred to the GRF to be returned to the Operations Fund.

Count II alleged that excess amounts of the increased fees, including the surcharge, were intended to be

deposited into the GRF and constitute taxes. The complaint alleged that there is no rational relationship between the causes of the budget imbalance and the group of persons, including the Chamber, who are obliged to contribute to the cost of operating the Commission. It was further alleged that, to the extent that it deliberately raises funds in excess of amounts needed to fund the operations of the Commission, the surcharge is an arbitrary use of the state's taxing power and violates the due process clauses of the United States and Illinois Constitutions. The relief prayed for in count II was the same as that requested in count I.

In a supplemental complaint filed at a later date, the Chamber added count III, alleging that the amount of the surcharge in excess of the amount needed to fund the Commission was a forced contribution of private property for public use, in violation of the takings clauses of the United States Constitution (U.S. Const., amend. V) and of the Illinois Constitution (Ill. Const. 1970, art. I, § 15).

Defendants filed motions to dismiss (735 ILCS 5/2—615 (West 2004)) both the original and supplemental complaints. The Chamber filed a motion for summary judgment. 735 ILCS 5/2—1005 (West 2004). Following arguments of counsel, the circuit court denied defendants' motion to dismiss and granted the Chamber's motion for summary judgment as to counts I and II of its complaint. The court held unconstitutional section 50—50 of the Budget Act (Pub. Act 93—32, § 50—50 (adding 215 ILCS 5/416)), which created the surcharge. The court ordered the State Treasurer to deposit all monies currently held or thereafter received pursuant to the surcharge in a separate escrow account and to allow no disbursements therefrom pending further order of the circuit court. The court also enjoined the Director from reallocating funds collected by means of the surcharge pursuant to the authority contained in new section 8j of

the State Finance Act. Subsequently, the circuit court denied defendants' motion to stay the judgment pending appeal and modified its injunctive order to allow the Commission to use other funds in the Operations Fund not derived from the surcharge.

The court entered a finding under Rule 304(a) as to the grant of summary judgment on uniformity and due process grounds and this appeal followed.

## ANALYSIS

### I. Standard of Review

Summary judgment is proper if, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2004). We review the circuit court's grant of summary judgment *de novo. Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

The constitutionality of a statute is a question of law and is, thus, reviewed *de novo. Miller v. Rosenberg*, 196 Ill. 2d 50, 57 (2001). In general, statutes carry a strong presumption of constitutionality (*People ex rel. Ryan v. World Church of the Creator*, 198 Ill. 2d 115, 120 (2001)), and the party challenging the statute has the burden of rebutting that presumption (*Russell v. Department of Natural Resources*, 183 Ill. 2d 434, 441 (1998)). In addition, this court has a duty to uphold the constitutionality of a statute when reasonably possible. *City of Chicago v. Morales*, 177 Ill. 2d 440, 448 (1997).

### II. Uniformity Clause

The Chamber argues that the surcharge imposed by the Budget Act violates the uniformity clause of the Illinois Constitution, which provides:

"In any law classifying the subjects or objects of non-

property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2.

The principles applied to uniformity analysis are well known. As we have stated:

"To survive scrutiny under the uniformity clause, a nonproperty tax classification must (1) be based on a real and substantial difference between the people taxed and those not taxed, and (2) bear some reasonable relationship to the object of the legislation or to public policy. [Citation.] The uniformity clause was intended to be a broader limitation on legislative power to classify for nonproperty tax purposes than the limitation of the equal protection clause [citation] and was meant to insure that taxpayers would receive added protection in the state constitution based upon a standard of reasonableness that is more rigorous than that contained in the federal constitution [citation]. The party attacking a tax classification is not required to negate every conceivable basis that might support it. [Citation.] When faced with a good-faith uniformity challenge, the taxing body bears the initial burden of producing a justification for the classification. The challenging party then has the burden of persuading the court that the taxing body's explanation is insufficient as a matter of law or unsupported by the facts. [Citations.] Despite the more stringent standard under the uniformity clause, the scope of a court's inquiry is 'relatively narrow.' [Citation.] '[I]n a uniformity clause challenge the court is not required to have proof of perfect rationality as to each and every taxpayer. The uniformity clause was not designed as a straitjacket for the General Assembly. Rather, the uniformity clause was designed to enforce minimum standards of reasonableness and fairness as between groups of taxpayers.' [Citation.]" *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 153 (2003).

### A. Classification Established by the Budget Act

The first step in our analysis is to identify the classification established by the Budget Act. Ordinarily, this

would not be a difficult task. However, the parties disagree as to the relevant classification. The Chamber argues that the Budget Act itself establishes the classification, *i.e.*, all Illinois fee payers. The Chamber points out that the transfer authority given to the Director of the OMB under section 8(j) is limited to those who must pay the Non-Consumer User Fees. Thus, according to the Chamber, the class established under the Budget Act consists of (1) those Non-Consumer User Fee payers who must pay the higher fees and whose fees may be transferred to the GRF to help alleviate the state's budget crisis and (2) those fee payers not subject to the higher fees and the Director's transfer authority. Defendants argue that the classification consists of all those persons and entities that may utilize the services of the Commission. The Budget Act divides that class into two subgroups: (1) employers who are required to provide workers' compensation benefits and (2) individual employees who may bring cases before the Industrial Commission and who are not required to provide such benefits.

Initially, we note that the Chamber contends defendants have waived their argument on the appropriate classification to use in this case. According to the Chamber, defendants argued to the circuit court that the proper classification is the universe of fee payers and that the Budget Act distinguishes between "consumer" and "non-consumer" fee payers. The Chamber argues that defendants' employer/employee classification is raised for the first time in this appeal. Counsel for defendants stated at oral argument in this case that the issue of the relevant classification was discussed in terms of both Consumer User Fee Payers/Non-Consumer User Fee Payers and employers/employees. The record reveals that in opposition to the Chamber's motion for summary judgment, defendants alleged that the Budget Act divided the fee-paying universe roughly into "consumer" and

"non-consumer" fee payers. Defendants noted, however, that this was not the only reasonable classification. Thus, defendants argued before the circuit court that the Budget Act raised fees on those fee payers who operate businesses in the state, but not, generally speaking, on individual consumers.

The circuit court accepted the Chamber's view of the relevant classification and found that the classification violated the uniformity clause. However, with regard to the question of whether there was a reasonable relationship between the classification and the object of the Budget Act, the court focused solely on the surcharge. We note that the rule of waiver is an admonition to the parties and not a limitation on the jurisdiction of this court. *In re W.C.*, 167 Ill. 2d 307, 323 (1995). A reviewing court may, in furtherance of its responsibility to provide a just result and to maintain a sound and uniform body of precedent, override considerations of waiver that stem from the adversarial nature of our system. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 504-05 (2002). We believe it appropriate to address the parties' arguments on the merits; accordingly, we decline to find waiver.

As noted, the Chamber argues that the relevant classification is that of all Illinois fee payers. It further argues that there is no real and substantial difference between those who pay the 300 fees affected by the Budget Act and the other approximately 1,200 fees that are not subject to the Director's transfer authority: they all pay fees for some service or regulation provided. According to the Chamber, prior to enactment of the Budget Act, the state treated all fee payers uniformly, imposing fees limited to the cost of providing the service or regulation. The Chamber argues that the fee payers targeted by the Budget Act have no relevant characteristics that distinguish them from the other fee payers and that the distinction drawn by the Budget Act between the two

groups of fee payers has no relationship to the purpose of the Budget Act to raise general revenues to balance the state's budget.

The Chamber's argument regarding the appropriate classification is not an unreasonable one. As a member of the group of 300 fee payers targeted by the Budget Act, the Chamber argues that it should not be required to pay fees that exceed the cost of the service provided, in contrast to those fee payers not included in that group. However, after identifying the classification and arguing that there is no real and substantial difference between the group of 300 fee payers subject to the Budget Act and the larger group of fee payers, the Chamber's uniformity analysis undergoes a transformation. The Chamber shifts its focus to an analysis of whether the surcharge bears a reasonable relationship to the purposes of the Budget Act. This change in focus is problematic for the Chamber. Having identified the broad classification of all fee payers, the Chamber must then apply the uniformity analysis to that broad classification. By not doing so, the Chamber implicitly recognizes that, as an employer subject to the surcharge, it has a direct interest in its validity and that a classification of all fee payers relates only indirectly to the surcharge. Defendants argue that the classification of all those who may utilize the services of the Commission is the proper focus for our review, and we agree. It is the Chamber's status as an employer, not as one of 300 fee payers, that is most relevant to the issues raised by the Chamber. Accordingly, we conclude that the appropriate classification is that of all those who may utilize the services of the Commission. This classification includes both employers and employees.

The Budget Act chose to impose the surcharge on employers who, like the Chamber, purchase and maintain insurance policies to insure their liability under the Workers' Compensation Act. No fees were imposed on

employees. We note that the Chamber does not argue that the imposition of the surcharge itself was improper, nor does it argue that a similar type of fee should have been imposed on employees. At oral argument, the Chamber's counsel explicitly stated that the Chamber does not take issue with paying some amount to fund the Commission. Its complaint is with the *amount* of the surcharge.

### B. Is There a Real and Substantial Difference Between Employers and Employees?

Defendants have the burden of producing a justification for the classification. Once that justification has been articulated, it is the Chamber's burden to produce evidence that the asserted justification is unsupported by the facts or is insufficient as a matter of law. As we explained in *Arangold*, 204 Ill. 2d at 156-57:

"[T]he taxing body need only assert a justification for the classification. It is the plaintiff who then has the evidentiary burden of proving that the asserted justification is unsupported by the facts. The more rigorous standard of reasonableness in uniformity analysis simply allows the plaintiff to mount a good-faith uniformity challenge without having the initial burden of disproving every conceivable explanation for the tax. The ultimate burden remains with the plaintiff, however, to demonstrate that the taxing body's asserted justification is unsupported by the facts or insufficient as a matter of law. To hold otherwise would undermine the well-settled principle that a statute bears a strong presumption of constitutionality and that the party challenging the statute has the burden of demonstrating the statute's unconstitutionality."

Defendants' asserted justification for the disparate treatment of employers and employees as to the surcharge is twofold. First, defendants note that distinguishing between individuals and organizations is common in the field of taxation and that such classifications as "individuals," "partnerships," and "corporations" do not violate the uniformity clause. See, *e.g.*, *Zunamon v.*

*Zehnder*, 308 Ill. App. 3d 69, 78 (1999) (finding no uniformity violation where trusts were treated differently than individuals as to allowable credit against income tax liability for taxes paid to other states). Second, defendants argue that the General Assembly could have reasonably concluded that employers as a group would be less burdened by an increase in fees than would individuals because of employers' ability to spread the cost over a larger budget or incorporate the cost into the price of goods and services. We find this last justification to be a reasonable one in the context of this case. The amount of the surcharge to be paid by each employer is based upon the amount of the premium paid by the employer to maintain workers' compensation insurance. As defendants suggest, this premium is likely to be based, at least in part, on the number of workers employed and the loss history of the particular employer. Accordingly, there may be some correlation between the surcharge and the frequency of an employer's utilization of the Commission's services. As with any other cost, an employer may incorporate it into the price of goods or services. The fact that the Budget Act does not require employees to bear a similar cost does not invalidate the classification established. Individual employees would not, for the most part, have the ability to absorb the cost of the surcharge that employers do. Even if this is not true in every case, perfect rationality is not required. *Geja's Café v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 252 (1992). Thus, we conclude that there exists a real and substantial difference between employers who pay the surcharge and employees who do not.

The Chamber does not address the question of whether there is a real and substantial difference between employers and employees for purposes of imposing the surcharge, largely because it disagrees that this is the appropriate classification. Accordingly, the Cham-

ber has failed to carry its burden to show that the classification is either unsupported by the facts or insufficient as a matter of law.

### C. Relationship Between the Classification and the Object of the Legislation

#### 1. *The Purpose of the Budget Act*

Defendants identify three purposes of the legislation as it relates to the surcharge: (1) to fund the direct operations of the Commission; (2) to raise funds in excess of the Commission's budgeted needs to recapture the costs of operating or supporting the Commission borne by other state agencies; and (3) to raise revenue to assist in alleviating the state's budget shortfall.

The Chamber does not dispute the accuracy of the first and third purposes. However, it contends that it was not part of the Budget Act's purpose to impose the surcharge to pay for indirect costs of the Commission paid out of the GRF or by other state agencies. The Chamber argues that the Budget Act accomplished the payment of indirect costs through the administrative charge-backs that were assessed against specific funds and not by increases in fees. It cites a June 2004 report from the Illinois Economic and Fiscal Commission (Economic Commission) entitled "Monthly Revenue Briefing." This report contains a table referred to as "Special Transfers in FY 2004 as of 6/30/2004." The report explains that these transfers were part of the FY2004 budget resulting in part from Public Act 93—32. The table contains columns for each fund name and the dollar amount of (1) charge-backs, (2) funds sweeps, (3) Executive Order 10 transfers, and (4) fee increases for each fund. The Chamber notes that this report shows no charge-backs or fund sweep of any money in the Operations Fund. The only transfer to the GRF was the fee increase amount of $28,293,000, shown in the fourth

column. Illinois Economic and Fiscal Commission, *Monthly Revenue Briefing, June 2004*, at 11. Therefore, it may be inferred that the Commission had no indirect costs to be paid. This, the Chamber argues, defeats defendants' indirect costs justification for the amount of the surcharge.

Defendants respond that all four of the mechanisms set forth in the Economic Commission's FY2004 report were designed to achieve the same goal, *i.e.*, address the imbalance between direct and actual agency costs. Defendants explain that the different terms for the transfers used by the Economic Commission in its report correspond to the authority provided in sections 8h, 8j, and 8.42 of the State Finance Act. According to defendants, since the surcharge is a new fee, it was logical to classify a transfer of surcharge funds to the GRF as a fee increase, rather than an administrative charge-back. Thus, defendants suggest, factual issues remain unresolved as to the alleged indirect costs justification for the surcharge and this case should be remanded to the circuit court for further proceedings.

As further proof that the surcharge was intended to provide a general revenue source for the state and not to pay indirect costs of the Commission, the Chamber cites language from the Comptroller's Fiscal Year 2003 Fee Imposition Report (Fee Report), in which the Comptroller discussed the 10 largest revenue-generating fees (which includes the Operations Fund):

> "The use of fee revenues for purposes not directly related to the service for which the fee is charged raises some interesting legal questions." Office of the Comptroller, *Fee Imposition Report, Fiscal Year 2003*, at 5.

The Fee Report then goes on to discuss the uniformity clause and the due process clause of the Illinois Constitution. The Chamber takes this as an admission that the amount of the surcharge was deliberately set far in excess of that necessary to support the Commission's operations

to provide a source of general revenue and not to pay indirect costs. The Chamber alleges that this mechanism was employed to avoid raising income taxes or sales taxes.

We disagree with the Chamber's interpretation of the quoted language from the Fee Report. The key phrase is "not directly related to." If, as the Chamber argues, the Comptroller's statement demonstrates that the excess revenues generated by the increased fees were intended to be used solely for purposes not at all related to the service provided, the Comptroller could have stated that the fee revenues were "not related" to the service for which the fees were charged. At best, the Comptroller's statement provides only equivocal support for the Chamber's argument that no excess revenues generated by the surcharge were intended to pay for any indirect costs of the Commission.

The Budget Summary submitted by the Governor to the General Assembly prior to enactment of Public Act 93—32 stated the purpose for increasing Non-Consumer User Fees:

"This budget proposes bringing user fees for state regulatory services and licenses in line with other states in order to recover actual program costs, generating over $300 million in new revenue to the state in fiscal year 2004." Illinois State Budget, Fiscal Year 2004, at 1—10.

A report from the Governor's Council of Economic Advisors (Council) provides further insight into the role increased user fees played in the budget. Under the heading "User Fee Adjustments," the report states in relevant part:

"The state currently collects almost 1,500 fees to cover the costs for relevant services. Many of the fees have not been adjusted for decades. Consequently they do not reflect the current cost of services they support and are below similar fees in other states.

This budget begins to address that imbalance by identifying the largest revenue generating fees that need

to be adjusted to reflect the impact of inflation on fee-supported programs as well as other cost increases over time[.]" Council of Economic Advisors, *Economic and Revenue Outlook*, ch. 9—22.

Under the heading "Administrative Chargebacks," the Council's report states in relevant part:

"According to the Illinois State Comptroller, there were 597 active individual funds in the official accounting system at the end of fiscal year 2002. Of the 597 active funds, 457 funds were appropriated. Funds have varying levels of administrative support activity based on the type of payments made from the fund. Some funds require a full array of state services, including accounting, investing, auditing, leasing, legal representation and others. Many of these services are provided by agencies financed through the General Revenue Fund.

Over time, the lack of GRF support from other funds has resulted in a 'free ride' for those funds at the expense of the General Revenue Fund. The subsidy of these funds reduces the amount available to help schools, the poor and seniors. Instead it supports various special interests. *** In order to ensure that each fund is paying for the additional administrative burden and end the [*de facto*] GRF subsidy, this budget creates a chargeback program that reflects the level of state services required by each fund. This is expected to pay for support services provided by agencies funded through the General Revenue Fund of approximately $330 million.

To partially pay for prior administrative cost subsidies, $144 million in fund balances will be transferred from select funds to the General Revenue Fund in fiscal year 2003. The total amount of deficit reduction from administrative chargebacks is $474 million." Council of Economic Advisors, *Economic and Revenue Outlook*, ch. 9—22.

The budget documents relied upon by the Chamber do not support its assertion that excess revenues generated by the surcharge were not intended to pay any indirect costs of the Commission but are intended to be used solely for purposes not related to the Commission. Rather, the documents are contradictory as to the treat-

ment of excess revenues generated by the surcharge. For example, the Chamber concedes that the purpose of the fund sweeps was to transfer accumulated revenue in the affected funds to the GRF. However, since the Commission was not self-supporting prior to establishment of the surcharge, the question arises as to whether the Operations Fund contained accumulated revenue to transfer under the funds sweep mechanism. The documents relied on by the Chamber do not answer this question.

There is no dispute that, prior to the establishment of the surcharge, the Commission had no independent source of funding. The Chamber does not deny that all of the Commission's expenditures were paid out of the GRF. Accordingly, the Commission was one of the entities that received a "free ride" from the GRF. One of the purposes of the Budget Act was to compensate the GRF for this "free ride" and to eliminate or minimize this problem in the future. The Chamber's argument is that the Operations Fund was somehow exempted from this statutory purpose because the transfer of money out of that fund was not characterized as either an administrative charge-back or a fund sweep. Thus, according to the Chamber, the money from the surcharge was transferred to the GRF to be used solely for purposes not related to the Commission. However, as defendants point out, the surcharge is a new fee. Section 8j of the State Finance Act, added by the Budget Act, explicitly provided the Director with authority to transfer the new and increased fees out of their respective funds and into the GRF. Administrative charge-backs and fund sweeps were authorized by other sections. We note that the text of section 8j does not state a purpose for the monies transferred from the funds. On the other hand, section 8h, which authorizes the administrative charge-backs, and section 8.42, which authorizes the fund sweeps, do contain statements of purpose for the transfers. Section

8h states that the funds were to be transferred to the GRF "in order to help defray the State's operating costs for the fiscal year." 30 ILCS 105/8h (West 2004). Section 8.42 authorizes the transfers from the designated funds into the GRF "[i]n order to address the fiscal emergency resulting from shortfalls in revenue." 30 ILCS 105/8.42 (West 2004). The Chamber has not addressed the significance of the language of these new statutory sections and how it may relate to the alleged purposes of the surcharge.

The Chamber has not demonstrated that the state simply bypassed the Operations Fund when it reclaimed money that had been spent by the GRF in the past on the various funds from which money was transferred. Thus, we conclude that the Chamber has not sustained its burden of proof to show that defendants' indirect costs justification is unsupported by the facts or is insufficient as a matter of law.

## 2. *Reasonable Relationship*

Defendants argue that the surcharge bears a reasonable relationship to the purposes of the Budget Act. According to defendants, the surcharge is reasonably related to the dual purposes of paying the direct and indirect costs of operating the Commission. Defendants also argue that the surcharge is reasonably related to the objective of the Budget Act to balance the state's overall budget in FY2004. Enactment of the surcharge helped to avoid the necessity of raising income taxes, which could be considered more burdensome, or raising sales taxes, which are regressive in nature. The Chamber argues that the surcharge is not reasonably related to the purpose of the Budget Act to raise additional revenue to balance the budget. The Chamber concedes that there is a reasonable relationship between the surcharge and recovering the costs of operating the Commission. In the Chamber's view, these costs equal the $13.7 million appropriated for

the Commission's operation in FY2004. As discussed above, the Chamber contests the legitimacy of the alleged purpose of recovering indirect costs of operating the Commission. As to the objective of balancing the state's budget, however, the Chamber argues that the state went well beyond the legitimate purpose of raising revenue for the cost of operating the Commission. The Budget Act required employers to pay much more than an amount needed to fund the Commission's FY2004 appropriation and created a mechanism (section 8j of the Workers' Compensation Act) for moving the excess revenue out of the Operations Fund into the GRF. Thus, the Chamber argues that there is no relationship at all between the amounts of revenue transferred to the GRF and the service for which the surcharge was imposed.

In connection with this contention, the Chamber argues that the state may not raise revenue for the GRF by increasing user fees far beyond what is required to pay for the service for which the fees are charged. Thus, according to the Chamber, all amounts generated by the surcharge in excess of the $13.7 million budgeted for the Commission are unrelated to the Commission and amount to a tax on employers. However, at oral argument in this case, counsel for the Chamber made clear that the Chamber does not argue that no amount of unspent money in the Operations Fund may be transferred to the GRF. Counsel stated that if a fee is set to compensate the state for operating the Commission and it turns out that the cost is less than was anticipated, it would be "entirely appropriate" to transfer that money to the GRF. Thus, the Chamber takes issue with the *intent* of the Budget Act to increase fees to a point far beyond what is needed to pay for the cost of service or regulation. However, as we explain below, we need not address this issue at this time.

The Chamber's argument that a portion of the

surcharge amounts to a tax rests upon its assumption that the Budget Act deliberately established the surcharge at a rate sufficient to generate far more revenue than is actually needed to operate the Commission. We have held that the Chamber failed to carry its evidentiary burden on the question of whether a purpose of the Budget Act was to generate revenue through the surcharge to pay indirect costs of the Commission. Those indirect costs, if any, would be in addition to the $13.7 million appropriated for the Commission for FY2004. The record before the circuit court does not contain sufficient information as to whether any of the amounts generated by the surcharge over and above the Commission's FY2004 appropriation could be characterized as intended for purposes not related in any way to the Commission.

Another factor to consider in connection with this issue is that the surcharge does not generate all the funds deposited into the Operations Fund. Self-insured employers pay the Fund Fee, which is based on the amount of their payroll. The surcharge has generated approximately $19 million, as opposed to the Fund Fee's $11 million. Illinois Economic and Fiscal Commission, *FY 2004 Fee and Penalty Increases*, § I, at 35. Accordingly, the surcharge is not responsible for the entire $28 million that was transferred to the GRF. Further, we note that after the Chamber filed its complaint, the General Assembly reduced the rate of the surcharge by almost one-third, from 1.5% to 1.01% of insurance premiums. 215 ILCS 5/416(b)(1) (West 2004). At the same time, the rate of the Fund fee was increased from 0.045% to 0.075%. 820 ILCS 305/4d(b) (West 2004). How these facts may affect the analysis, if at all, is unknown. Given these uncertainties, it would be inappropriate at this time to address the Chamber's argument concerning the relationship between user fees and balancing the state's budget. We

express no opinion regarding the state's method of balancing the FY2004 budget. We merely hold that the record has not been sufficiently developed to allow us to address the issue and that the circuit court's grant of summary judgment to the Chamber was premature. Accordingly, we hold that the Chamber has failed to carry its evidentiary burden under the uniformity clause.

Finally, the Chamber argues that defendants have waived their argument that summary judgment should not have been granted because material factual issues remain to be resolved. According to the Chamber, defendants did not make this argument before the circuit court. We have reviewed the record and conclude that the Chamber is incorrect. Counsel for defendants did raise the indirect costs issue before the circuit court during argument on the parties' motions. Thus, no waiver occurred.

### III. Due Process Clause

The Chamber's argument alleging a due process violation in connection with the amount of the surcharge is, like its uniformity challenge, based upon the assumption that more than one-half of the revenue generated by the surcharge was transferred to the GRF to be used for purposes completely unrelated to the Commission. As we have held, questions of material fact exist that preclude summary judgment. Accordingly, we hold that the Chamber has failed to show a violation of its due process rights and that the circuit court should not have granted the Chamber's summary judgment motion on this ground.

### IV. Takings Clause

The circuit court denied the Chamber's motion for summary judgment as to count III of its supplemental complaint. That count alleged that the Budget Act violated the takings clauses of the United States and Il-

linois Constitutions. The present appeal is before this court pursuant to Rule 304(a). The notice of appeal filed by defendants seeks reversal of (1) the circuit court's order granting the Chamber's motion for summary judgment and finding the Budget Act unconstitutional on uniformity and due process grounds and (2) the circuit court's subsequent injunctive order. An order denying a motion for summary judgment is ordinarily not a final order and is therefore not appealable. However, an exception exists where parties have filed opposing motions for summary judgment and the circuit court has granted one motion and denied the other. *Chavda v. Wolak*, 188 Ill. 2d 394, 403 (1999). That is not the case here. Defendants filed a motion to dismiss the complaint. They did not include the circuit court's order denying that motion in their notice of appeal, nor have they argued in their brief any issues regarding that order. The Chamber's supplemental complaint alleging a cause of action under the takings clause is still pending before the circuit court. The Chamber has not identified any ground upon which we may review the denial of summary judgment as to its cause of action under the takings clause. Instead, the Chamber presents its takings argument as an alternate ground upon which to affirm the circuit court's grant of summary judgment. However, were we to address its argument, we would, in effect, be reviewing the circuit court's order denying summary judgment on that ground. We decline to do so, as the alleged takings clause violation is not properly before this court.

## CONCLUSION

For the reasons stated, we conclude that the circuit court erred in granting summary judgment to the Chamber. Accordingly, we reverse the circuit court's order granting the Chamber's summary judgment motion. We affirm the circuit court's order denying defendants' motion to dismiss and remand to the circuit court

for further proceedings on the Chamber's original and supplemental complaints.

*Circuit court judgment affirmed in part and reversed in part; cause remanded.*