NOTICE

Decision filed 03/02/06.

The text of this decision

may be changed or corrected

 prior to the filing of a Petition for

Rehearing or the disposition

of the same.

NO. 5-04-0082

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | |
|---|---|
| GENE ARNETT, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant, | ) Alexander County. |
| | ) |
| v. | ) No. 02-MR-35 |
| | ) |
| HOMER MARKEL, DAVID TAYLOR, | ) |
| LESLIE MARKEL, SALLY RAMSEY, | ) |
| KAREN ELDER, GEORGE WELBORN, | ) |
| CAROLYN DUMAS, TERRI ANDERSON, | ) |
| NANCY TUCKER, and DONALD SNYDER, | ) Honorable |
| | ) Stephen L. Spomer, |
| Defendants-Appellees. | ) Judge, presiding. |

_____

JUSTICE HOPKINS delivered the opinion of the court:

The plaintiff, Gene Arnett, an inmate at Tamms Correctional Center (Tamms), brought this civil rights action, pursuant to section 1983 of the Civil Rights Act of 1871 (42 U.S.C. §1983 (2000)), alleging that the defendants, Captain Homer Markel, David Taylor, Leslie Markel, Sally Ramsey, Karen Elder, George Welborn, Carolyn Dumas, Terri Anderson, Nancy Tucker, and Donald Snyder, violated his first amendment right to freedom of speech by refusing to allow him to mail an internal investigative report out of Tamms. The circuit court of Alexander County granted a summary judgment in favor of the defendants. On appeal, Arnett argues that the circuit court erred in denying his motion to disqualify the Attorney General's office from representing the defendants and in holding that the defendants

1

did not violate his first amendment right to freedom of speech. We affirm in part and reverse in part.

## BACKGROUND

In May of 2000, Arnett and two other inmates attempted to escape from Tamms, a closed, maximum-security prison operated by the Illinois Department of Corrections (DOC). The inmates used hacksaw and jigsaw blades to attempt to cut through the bars on their cell windows. When DOC officials discovered the attempted escape, they suggested to the press that the saw blades might have been hidden in the binding of a hardcover book delivered as legal mail to an inmate, that such mail typically comes from attorneys, and that the law prohibits them from searching legal mail.

The DOC's internal investigations department investigated the attempted escape and prepared an investigation report, which was dated November 22, 2000. The report indicated that a sister of one of the other inmates involved in the attempted escape had successfully mailed the saw blades into Tamms, not once, but twice, by disguising the envelopes as legal mail. The report also described where the inmates had hidden the saw blades within Tamms and how they had used them to attempt to saw through the bars on their windows. The report also included statements that inmates, guards, and confidential sources had made to the investigator.

On April 3, 2001, Arnett was criminally charged in the circuit court of Alexander County with possession of contraband in a penal institution and attempted escape. People v. Arnett, No. 01-CF-31. While the criminal case was pending, a DOC investigator gave the Alexander County State's Attorney a copy of the report, the State's Attorney gave Arnett and his attorney copies of the report during discovery, and the State's Attorney filed a copy of the report among the discovery pleadings in the criminal case.

2

In May of 2001, Arnett made prison officials at Tamms aware that he had a copy of the report, including guards' home addresses. In response, on May 21, 2001, prison officials at Tamms removed the report from Arnett's cell and redacted the guards' addresses. At that time, prison officials also discovered that Arnett had a schematic drawing of a cell window, which they also removed. Prison officials then returned the report, in its redacted form, to Arnett.

At that time, defendant George Welborn, the warden at Tamms, and Shelton Frey, the DOC's in-house legal counsel, determined that they should seek a protective order to prevent Arnett from disseminating the guards' home addresses and the schematic drawing. At the DOC's request, the Attorney General's office intervened in the criminal case and filed a motion for a protective order barring public access to certain materials filed by the State's Attorney (including the guards' home addresses and the schematic drawing). At the hearing on the motion, the DOC was represented by the Attorney General's office, but the DOC's in-house legal counsel also played an active role. The trial court entered a limited protective order. However, the Attorney General's office did not request, and the circuit court did not enter, a protective order covering that portion of the report at issue in this case.

On September 8, 2001, after the criminal proceedings terminated as a result of Arnett's guilty plea, Arnett attempted to mail the report, along with a brief cover letter, to Jim Winters, the director of Chicago Commons. According to Arnett, he wanted to mail the report to Winters because he knew that Winters was active in several community organizations in Chicago, and he wanted to show that the DOC's statements to the press about how the saw blades had been smuggled into Tamms were false. Mailroom staff did not mail the letter and report. Instead, they provided the letter and report to defendant Homer Markel, the captain in charge of internal affairs at Tamms, for review.

On September 18, 2001, Arnett filed a formal grievance, complaining that the letter

3

and report had not been mailed. Initially, prison officials in both the mailroom and internal affairs claimed that they had no knowledge of the letter.

According to Captain Markel, he had misplaced the letter and report and did not discover them in his desk until November 2, 2001. At that time, he reviewed the report and determined that mailing the report presented a threat to the safety and security of the prison. Specifically, Captain Markel determined that safety and security concerns included the potential identification of confidential sources, a detailed account of how saw blades had been successfully smuggled into the prison, a detailed account of where saw blades had been successfully hidden within the prison, and the confirmation (and identification) of another inmate's involvement in providing information to investigators, along with that inmate's family members' home addresses. Captain Markel determined that the information detailing the security measures at the prison, or the lack thereof, would constitute a threat to the prison because it would allow individuals to circumvent that security when planning escapes, trying to introduce contraband into the prison, or trying to harm prison employees. Captain Markel also determined that the identification of confidential sources and their family members could lead to the physical harm of those individuals, as well as instability within the prison setting. Captain Markel brought the matter to the attention of Warden Welborn, who ultimately decided not to allow Arnett to mail the report. Captain Markel returned the letter and report to Arnett and told Arnett that he would not be allowed to mail the report because it would be a threat to the safety and security of the prison.

At that time, Arnett filed a second grievance regarding the DOC's refusal to mail the report. Both of his grievances were subsequently denied in final administrative decisions.

On May 15, 2002, Arnett filed the instant action. In his *pro se* complaint, Arnett alleged that the defendants' refusal to allow him to mail the report violated his first amendment right to freedom of speech. He alleged that he could freely disseminate the

4

report because the State produced it during discovery in the criminal proceedings against him and filed it in the criminal court case file. Arnett alleged that the report contained evidence regarding the lack of security at Tamms, which was of general public interest and which would have been embarrassing to the DOC and to the defendants.

Arnett named several defendants in the complaint, including Captain Markel and Warden Welborn (who had refused to allow him to mail the report); David Taylor, Leslie Markel, Sally Ramsey, Karen Elder, and Carolyn Dumas (grievance officers and related personnel); Terri Anderson and Nancy Tucker (members of the administrative review board that hears grievance appeals); and Donald Snyder (the Director of Corrections at that time). In the complaint, Arnett sought both damages and an injunction allowing him to mail the report.

On July 10, 2002, an attorney entered his appearance on Arnett's behalf and filed a motion to disqualify the Attorney General's office from representing the defendants. The motion alleged that on March 27, 2002, after exhausting all of his administrative remedies, Arnett wrote a letter to then-Attorney General Jim Ryan and asked him to investigate the censorship of his outgoing mail, which is the subject of this case.[1] Arnett alleged that he sent the letter to engage "the Attorney General's Division for the Enforcement of Civil and Equal Rights to remedy [the] defendants' unconstitutional censorship of his outgoing mail." Arnett did not specify how he had addressed the letter, other than to state that he had written to "Attorney General Ryan." The letter was forwarded to Christopher L. Higgerson, an assistant Attorney General in the Attorney General's general law division. Higgerson was responsible for defending other litigation initiated by Arnett, and Higgerson ultimately was assigned to represent the defendants in this case. Arnett argued that the Attorney General's

---

[1]Arnett's letter to Attorney General Ryan was never made a part of the record.

5

office should be disqualified from representing the defendants so the defendants would not have the advantage of the information he had provided in his attempt to obtain representation.

At a hearing on August 26, 2002, the circuit court denied Arnett's motion to disqualify the Attorney General's office but ordered that a different assistant Attorney General–one who had not read Arnett's letter–be assigned to represent the defendants. On September 27, 2002, in compliance with the order, a different assistant Attorney General was substituted as defense counsel.

On November 17, 2003, the defendants filed a motion for a summary judgment, arguing that they had not violated Arnett's first amendment right to freedom of speech because the law permitted them to refuse to mail the report based on safety and security concerns. The defendants further argued that all of them except Captain Markel and Warden Welborn were entitled to a summary judgment because they were not "personally responsible for any constitutional violation" if there was one. Finally, the defendants argued that they were entitled to a summary judgment on Arnett's damages claim because that claim was barred by qualified immunity.

On December 15, 2003, Arnett filed his response to the defendants' motion for a summary judgment. In his response, Arnett argued that the motion for a summary judgment should be denied because the defendants failed to meet their burden of showing that mailing the report would be a threat to safety or security, especially when the report was freely available to the public in the criminal case file in Alexander County.

On January 23, 2004, the circuit court entered an order granting a summary judgment in favor of the defendants. The court found that the defendants had not violated Arnett's first amendment right to freedom of speech. The court further found that all of the defendants except Captain Markel and Warden Welborn were entitled to a summary judgment because they were not personally responsible for the claimed constitutional deprivation. Finally, the

6

court found that the defendants were entitled to a summary judgment on Arnett's damages claim, based on qualified immunity. Arnett filed a timely notice of appeal.

ANALYSIS

On appeal, Arnett first argues that the trial court erred in denying his motion to disqualify the Attorney General's office from representing the defendants. Arnett bases his claim on the supposed disclosure of confidences that occurred when his unsolicited letter to then-Attorney General Ryan, which he claims was intended for the civil rights bureau of the Attorney General's office, was forwarded to assistant Attorney General Higgerson in the general law division. Higgerson was defending other litigation brought by Arnett, and he ultimately was assigned to represent the defendants in this case.

Determining whether to disqualify an attorney is within the trial court's discretion, and the trial court's determination will not be disturbed on appeal absent an abuse of that discretion. *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997). "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." *Schwartz*, 177 Ill. 2d at 176.

In *Hadley v. Ryan*, 345 Ill. App. 3d 297, 303 (2003), which is factually similar to the present case, the court declined to disqualify the Attorney General's office. In *Hadley*, a prisoner-plaintiff was unhappy with certain actions of prison officials and sent then-Attorney General Jim Ryan a complaint outlining proposed criminal charges against the prison officials, but the Attorney General's office declined to file any charges. *Hadley*, 345 Ill. App. 3d at 299. The plaintiff in *Hadley* subsequently filed a *mandamus* complaint against Attorney General Ryan and certain prison officials. *Hadley*, 345 Ill. App. 3d at 299-300. The Attorney General's office entered an appearance on the defendants' behalf, and the plaintiff moved to strike the appearance. *Hadley*, 345 Ill. App. 3d at 300. Without ruling on

7

the plaintiff's motion, the circuit court granted the defendants' motion to dismiss. *Hadley*, 345 Ill. App. 3d at 300, 303.

On appeal in *Hadley*, the plaintiff argued that the circuit court had abused its discretion in failing to rule on his motion to strike the appearance of the Attorney General's office. *Hadley*, 345 Ill. App. 3d at 303. The plaintiff argued that there was a conflict of interest because the Attorney General's office was required to represent the interests of " 'all of the people of the State of Illinois,' " including prisoners as well as state employees. *Hadley*, 345 Ill. App. 3d at 303. In rejecting the plaintiff's argument, the appellate court found that no conflict of interest existed because, although the Attorney General's office represents the people of the State of Illinois, the Attorney General's office does not represent private individuals. *Hadley*, 345 Ill. App. 3d at 303.

Similarly, in the present case, no conflict of interest existed because the Attorney General's office does not represent private individuals and there was no attorney-client relationship between Arnett and the Attorney General's office. See *Hadley*, 345 Ill. App. 3d at 303. In addition, the circuit court reasonably resolved the issue by ordering that a different assistant Attorney General–one who had not received and read Arnett's letter–take over as defense counsel. The ruling protected Arnett's interest in avoiding disclosures not intended for his opponents and, at the same time, allowed the Attorney General's office to fulfill its statutory duty to provide the defendants a free defense. Accordingly, the circuit court did not abuse its discretion in refusing to disqualify the Attorney General's office from representing the defendants in this case. See *Schwartz*, 177 Ill. 2d at 176.

In his opening brief on appeal, Arnett did not challenge the circuit court's finding that all of the defendants except Captain Markel and Warden Welborn were entitled to a summary judgment on the basis that they were not personally responsible for the claimed constitutional deprivation; nor did he challenge the circuit court's finding that all of the defendants were

8

entitled to a summary judgment on his damages claim, based on qualified immunity. Supreme Court Rule 341(e)(7) provides, in pertinent part, "Points not argued [in an appellant's brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." 188 Ill. 2d R. 341(e)(7). Accordingly, those arguments are waived, and the only issue left on appeal is whether the circuit court erred in granting a summary judgment in favor of defendants Captain Markel and Warden Welborn on Arnett's first amendment claim seeking an injunction allowing him to mail the report.

"Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005); see 735 ILCS 5/2-1005(c) (West 2004). "We review the circuit court's grant of summary judgment *de novo*." *Illinois State Chamber of Commerce v. Filan*, 216 Ill. 2d 653, 661 (2005). In addition, where, as here, the issue on appeal is limited to the application of the relevant constitutional principles to undisputed facts, the standard of review is *de novo*. *City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005).

Initially, Arnett argues that the trial court erred in holding that *Turner v. Safley*, 482 U.S. 78, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987), instead of *Procunier v. Martinez*, 416 U.S. 396, 40 L. Ed. 2d 224, 94 S. Ct. 1800 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989), applies to the censorship of a prisoner's outgoing mail. As the defendants correctly argue, because Arnett agreed in the circuit court that *Turner* set the standard, on appeal we could find that he has waived the right to complain of the error. See *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) (" 'It is fundamental to [the] adversarial process that a party waives his right to complain of an error

9

where to do so is inconsistent with the position taken by the party in an earlier court proceeding' " (quoting *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 543 (1984))). However, "the rule of waiver is an admonition to the parties and not a limitation on the jurisdiction of this court." *Filan*, 216 Ill. 2d at 664. "A reviewing court may, in furtherance of its responsibility to provide a just result and to maintain a sound and uniform body of precedent, override considerations of waiver that stem from the adversarial nature of our system." *Filan*, 216 Ill. 2d at 664. In the present case, we elect to address the argument on appeal.

The United States Supreme Court has articulated two standards of review for first amendment claims regarding interference with a prisoner's mail. *Thornburgh v. Abbott*, 490 U.S. 401, 408-09, 104 L. Ed. 2d 459, 470, 109 S. Ct. 1874, 1879 (1989).

For incoming mail or mail within the prison system, a court will uphold regulations or actions restricting inmate mail if they are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 96 L. Ed. 2d at 79, 107 S. Ct. at 2261; see also *Thornburgh*, 490 U.S. at 409-14, 104 L. Ed. 2d at 470-74, 109 S. Ct. at 1879-82.

However, the Supreme Court has articulated a less deferential standard for reviewing the censorship of outgoing prisoner mail. See *Thornburgh*, 490 U.S. at 409-14, 104 L. Ed. 2d at 470-74, 109 S. Ct. at 1879-82. To legitimately censor outgoing mail, prison officials must show two things. *Martinez*, 416 U.S. at 413, 40 L. Ed. 2d at 240, 94 S. Ct. at 1811. "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Martinez*, 416 U.S. at 413, 40 L. Ed. 2d at 240, 94 S. Ct. at 1811. "Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez*, 416 U.S. at 413, 40 L. Ed. 2d at 240, 94 S. Ct. at 1811.

Arnett is correct that, because this is a case about *outgoing*, and not *incoming*, prisoner mail, the trial court erred in applying *Turner* instead of *Martinez*. See *Thornburgh*, 490 U.S.

10

at 413, 104 L. Ed. 2d at 473, 109 S. Ct. at 1881-82. However, the defendants argue that even under the less deferential *Martinez* standard, refusing to allow Arnett to mail the report does not violate his first amendment right to freedom of speech because the report implicates safety and security concerns under constitutionally valid DOC regulations.

The DOC's outgoing mail regulation (20 Ill. Adm. Code §525.130(h) (2001)) permits employees to "spot check and read outgoing non[]privileged mail." "Outgoing non[]privileged mail *** may be *** withheld from delivery if it presents a threat to security or safety ***." 20 Ill. Adm. Code §525.130(h) (2001). The regulation specifies nine types of communications that present a threat to security or safety, including letters that "contain[] information regarding sending contraband into or out of the facility, plans to escape, or plans to engage in criminal activity" and letters that "contain[] information which, if communicated, might result in physical harm to another." 20 Ill. Adm. Code §525.130(h)(3), (h)(7) (2001).

In *Gaines v. Lane*, 790 F.2d 1299, 1302-05 (7th Cir. 1986), which involved a facial challenge to an earlier, substantively similar version of this regulation, the Seventh Circuit upheld the validity of the regulation. Applying *Martinez*, the court found that the regulation furthered the important governmental interests of safety and security and that the regulation was "well-tailored to minimize [its] intrusiveness" and was not overly broad. *Gaines*, 790 F.2d at 1304-05. The court also concluded that the regulation struck " 'a proper balance between the constitutional rights of [prisoners] and the legitimate concerns of prison officials.' " *Gaines*, 790 F.2d at 1305 (quoting *Meadows v. Hopkins*, 713 F.2d 206, 211 (6th Cir. 1983)).

However, in the present case, unlike in *Gaines*, Arnett is not arguing that the regulation is invalid *on its face*. Instead, he is arguing that the regulation is invalid *as applied* under the particular facts in this case.

11

Under the first prong of the *Martinez* test, the defendants have the burden of showing that preventing Arnett from mailing the report furthers "an important or substantial governmental interest unrelated to the suppression of expression" (*Martinez*, 416 U.S. at 413, 40 L. Ed. 2d at 240, 94 S. Ct. at 1811). The defendants argue that preventing Arnett from mailing the report furthers the important or substantial governmental interest in safety and security.

In response, Arnett argues that preventing him from mailing the report does not further any important or substantial governmental interest because the report is already freely available to the public in both the criminal and civil case files in the circuit court of Alexander County. In support of his argument, Arnett relies upon, *inter alia*, the United States Supreme Court's decision in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975).

In *Cox Broadcasting Corp.*, a reporter broadcast a murder-rape victim's name on a television news program. *Cox Broadcasting Corp.*, 420 U.S. at 471-74, 43 L. Ed. 2d at 335-37, 95 S. Ct. at 1034-35. The reporter had obtained the victim's name from the criminal indictment, which was a part of the public record in the criminal case. *Cox Broadcasting Corp.*, 420 U.S. at 472-73, 43 L. Ed. 2d at 336, 95 S. Ct. at 1035. The victim's father sued the reporter and the broadcasting company who owned the television station for damages for invasion of privacy, relying on a state statute making it a misdemeanor to broadcast a rape victim's name. *Cox Broadcasting Corp.*, 420 U.S. at 471-73, 43 L. Ed. 2d at 335-37, 95 S. Ct. at 1034-35.

The issue presented in *Cox Broadcasting Corp.* was "whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from public records–more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection." *Cox Broadcasting*

12

*Corp.*, 420 U.S. at 491, 43 L. Ed. 2d at 347, 95 S. Ct. at 1044.  In *Cox Broadcasting Corp.*, the Court held that the State could not constitutionally impose sanctions for the accurate publication of a rape victim's name obtained from judicial records open to public inspection. *Cox Broadcasting Corp.*, 420 U.S. at 491, 43 L. Ed. 2d at 347, 95 S. Ct. at 1044.

The Court explained the rationale for its holding as follows:

"By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served.  Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media.  The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.  In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

*** [T]he First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records.  If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information.  Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish.  Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.  ***

*** Appellee has not contended that the name was obtained in an improper fashion or that it was not on an official court document open to public inspection.

13

Under these circumstances, the protection of freedom of the press provided by the First and Fourteenth Amendments bars the State of Georgia from making appellants' broadcast the basis of civil liability." *Cox Broadcasting Corp.*, 420 U.S. at 495-97, 43 L. Ed. 2d at 349-50, 95 S. Ct. at 1046-47.

The defendants argue that *Cox Broadcasting Corp.* is not helpful to our analysis in this case simply because Arnett is a prisoner. We disagree.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84, 96 L. Ed. 2d at 75, 107 S. Ct. at 2259. "It is settled that a prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Turner*, 482 U.S. at 95, 96 L. Ed. 2d at 83, 107 S. Ct. at 2265 (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 41 L. Ed. 2d 495, 501, 94 S. Ct. 2800, 2804 (1974)). As the Court held in *Martinez*, the censorship of a prisoner's outgoing mail is justified only if the following two criteria are met:

"First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. *** [A]ny regulation or practice that restricts inmate correspondence must be generally

14

necessary to protect one or more of the legitimate governmental interests identified above." *Martinez*, 416 U.S. at 413-14, 40 L. Ed. 2d at 240, 94 S. Ct. at 1811-12. The less deferential *Martinez* analysis is limited to outgoing mail because "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh*, 490 U.S. at 413, 104 L. Ed. 2d at 473, 109 S. Ct. at 1881-82. "[O]utgoing personal correspondence from prisoners[][does] not, by its very nature, pose a serious threat to prison order and security." *Thornburgh*, 490 U.S. at 411, 104 L. Ed. 2d at 471-72, 109 S. Ct. at 1880.

In the present case, a DOC investigator intentionally gave a copy of the report to the Alexander County State's Attorney, without putting any restrictions on the use of the report. The State's Attorney then intentionally gave copies of the report to Arnett and his attorney during discovery in the criminal case against Arnett, without putting any restrictions on the use of the report. The State's Attorney then intentionally filed a copy of the report, along with other discovery documents, in the criminal case file in the circuit court of Alexander County. The State's Attorney did not attempt to file the report under seal so that it would not be available to the public.

In addition, when prison officials, including the DOC's in-house legal counsel and Warden Welborn, discovered that Arnett had a copy of the report and requested that the Attorney General's office intervene in the criminal case to request a protective order barring public access to certain materials filed by the State's Attorney, including guards' home addresses and the schematic drawing, they did not ask the Attorney General's office to attempt to seal the remainder of the report, which is what Arnett attempted to mail out in this case. Accordingly, the Attorney General's office did not include that portion of the report at issue in this case within the motion for a protective order. Moreover, both the Attorney General's office and the DOC's in-house legal counsel played an active role at the hearing on

15

that motion, but neither of them requested a protective order covering that portion of the report at issue in this case. As a result, the trial court sealed those parts of the report that revealed the guards' home addresses and the schematic drawing but did not seal the remainder of the report. Accordingly, that portion of the report at issue in this case was, and still is, freely available to the public in the criminal case file in Alexander County.

Moreover, when Arnett filed the instant case in the circuit court of Alexander County and attached a copy of the report to his complaint, the defendants did not seek a protective order in the civil case. In fact, when the defendants filed their motion for a summary judgment in this case, they intentionally attached a copy of the report. They did not seek a protective order barring public access to the report, nor did they seek to file the report under seal, nor did they seek to file a redacted version of the report. Thus, it is clear from the defendants' own actions in this case that they have no concern about maintaining the report in confidence.

By intentionally filing a copy of the report in the publicly accessible court file in the criminal case against Arnett, by intentionally filing a copy of the report in the publicly accessible court file in the instant civil case, and by making no effort whatsoever to get a protective order barring public access to the report, "the State must be presumed to have concluded that the public interest was thereby being served" (*Cox Broadcasting Corp.*, 420 U.S. at 495, 43 L. Ed. 2d at 349, 95 S. Ct. at 1046).

It is undisputed that under *Cox Broadcasting Corp.*, the defendants could not constitutionally prevent the Chicago Tribune or the Southern Illinoisan from publishing the entire contents of the report. See *Cox Broadcasting Corp.*, 420 U.S. at 495-97, 43 L. Ed. 2d at 349-50, 95 S. Ct. at 1046-47. In addition, it is undisputed that Winters could go to the Alexander County courthouse in Cairo, request to see either Arnett's criminal case file or the civil case file in the present case, pay the copying fee, and get a copy of the entire report.

16

Therefore, *under the particular facts in the present case*, and in light of the Supreme Court's rationale in *Cox Broadcasting Corp.*, 420 U.S. at 496-97, 43 L. Ed. 2d at 350, 95 S. Ct. at 1047, we find that the defendants' refusal to allow Arnett to mail the report fails the first prong of the *Martinez* test, *i.e.*, that any restriction on a prisoner's first amendment right to send outgoing mail must *further* "an important or substantial governmental interest unrelated to the suppression of expression" (*Martinez*, 416 U.S. at 413, 40 L. Ed. 2d at 240, 94 S. Ct. at 1811). Accordingly, we find that the defendants' refusal to allow Arnett to mail the report violates Arnett's first amendment right to freedom of speech (see *Martinez*, 416 U.S. at 413, 40 L. Ed. 2d at 240, 94 S. Ct. at 1811) and that the circuit court, therefore, erred in granting a summary judgment in favor of the defendants on Arnett's claim seeking an injunction allowing him to mail the report (see *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 305; 735 ILCS 5/2-1005(c) (West 2004)). Pursuant to Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)), we enter a judgment in favor of Arnett and against defendants Captain Markel and Warden Welborn on Arnett's first amendment claim seeking an injunction allowing him to mail the report, and we order prison officials at Tamms to allow Arnett to mail the report.

CONCLUSION

For the foregoing reasons, the order of the circuit court of Alexander County denying Arnett's motion to disqualify the Attorney General's office from representing the defendants in this case is affirmed; that portion of the circuit court's order granting a summary judgment in favor of all of the defendants on Arnett's first amendment claim seeking damages is affirmed; that portion of the circuit court's order granting a summary judgment in favor of all of the defendants except Captain Markel and Warden Welborn is affirmed; that portion of the circuit court's order granting a summary judgment in favor of defendants Captain Markel and Warden Welborn on Arnett's first amendment claim seeking an injunction allowing him to

17

mail the report is reversed; a judgment is entered in favor of Arnett and against defendants Captain Markel and Warden Welborn on Arnett's first amendment claim seeking an injunction allowing him to mail the report; and prison officials at Tamms are ordered to allow Arnett to mail the report.

Affirmed in part and reversed in part; judgment entered.

DONOVAN and McGLYNN, JJ., concur.

NO. 5-04-0082

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| GENE ARNETT, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Alexander County. |
| | ) | |
| v. | ) | No. 02-MR-35 |
| | ) | |
| HOMER MARKEL, DAVID TAYLOR, | ) | |
| LESLIE MARKEL, SALLY RAMSEY, | ) | |
| KAREN ELDER, GEORGE WELBORN, | ) | |
| CAROLYN DUMAS, TERRI ANDERSON, | ) | |
| NANCY TUCKER, and DONALD SNYDER, | ) | Honorable |
| | ) | Stephen L. Spomer, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

**Opinion Filed**:     March 2, 2006

_____

**Justices**:     Honorable Terrence J. Hopkins, J.

Honorable James K. Donovan, J., and
Honorable Stephen P. McGlynn, J.,
Concur

_____

**Attorney**     Alan Mills, Uptown People's Law Center, 4404 North Broadway, Chicago, IL
**for**          60640
**Appellant**

_____

**Attorneys**    Lisa Madigan, Attorney General, State of Illinois, Laura Wunder, Assistant Attorney
**for**          General, Gary Feinerman, Solicitor General, 100 West Randolph Street, 12th Floor,
**Appellees**    Chicago, IL 60601

_____